## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

PAUL ALLEN OLSON, Individually,
and as Relator for the United States
of America and State of Minnesota,

        Plaintiff,

v.

FAIRVIEW HEALTH SERVICES
OF  MINNESOTA, and its wholly
owned subsidiary or affiliate
UNIVERSITY OF MINNESOTA
MEDICAL CENTER, FAIRVIEW,
a/k/a FAIRVIEW UNIVERSITY
MEDICAL CENTER.

        Defendant.

**MEMORANDUM OF LAW
AND ORDER**
Civil File No. 13-2607 (MJD/JJK)

---

Brian E. Wojtalewicz, Wojtalewicz Law Firm, LTD, Counsel for Plaintiff.

Douglas R. Peterson, Andrew W. Davis and Kristin Berger Parker, Stinson
Leonard Street LLP, Counsel for Defendant.

---

This matter is before the Court on Defendant's Motion to Dismiss.  [Docket

No. 27]  The Court heard oral argument on October 24, 2014.

### A.    Factual Background

## 1.    The Parties

Plaintiff Paul Allen Olson ("Olson") is a resident of Ramsey County,

Minnesota.  ([Docket No. 20] Second Amended Complaint ("SAC") ¶ 2.)  Olson

worked for the Minnesota Department of Human Services ("DHS") for twenty-

nine years.  (Id.)  Most recently, he was Manager of Payment Policy and Rates

Management.  (Id.)  In this capacity, Olson established payment rates for

inpatient hospitals that provide services to Medical Assistance ("MA" or

"Medicaid") patients.  (Id., Ex. D-5.)

Defendant Fairview Health Services of Minnesota owns and operates

hospitals throughout Minnesota, including Defendant University of Minnesota

Medical Center, Fairview ("UMMC"), formerly known as Fairview University

Medical Center ("FUMC").  (Id. ¶¶ 3, 4.)  The University of Minnesota Children's

Hospital is the children's unit at UMMC, formerly known as Amplatz Children's

Hospital ("Amplatz").  (Id.)

Non-party DHS is responsible for processing and paying MA billings.  (Id.

¶¶ 11, 28.)

## 2.    Medical Assistance

MA is a government program that provides medical care for indigent and

disabled individuals.  (Id. ¶ 11.)  It is funded jointly by state and federal

2

government in approximately equal shares.  (<u>Id.</u>)  In Minnesota, MA is

administered by DHS.  (<u>Id.</u>)  The procedure for determining MA payment rates

to hospitals is described in Minnesota Statute section 256.969.  (<u>Id.</u> ¶ 12.)

### a)      MA Payment Protocol

Hospitals submit MA patient claims to DHS electronically via a "uniform

billing claim form."  (<u>Id.</u> ¶ 28.)  Each claim includes patient data, services

provided, and the "sticker price" of medical services rendered.  (<u>Id.</u> ¶¶ 28, 35.)

The "sticker price" is the top price:  what an uninsured or non-MA patient might

pay.  (<u>Id.</u> ¶ 35.)  MA patients pay substantially less because DHS reimburses the

patient's hospital at a predetermined rate.  (<u>Id.</u>)

To determine the MA reimbursement rate, DHS enters each MA claim into

a payment computer system.  (<u>Id.</u> ¶ 28.)  Next, the claim is "priced."  (<u>Id.</u>)

Various laws, rules, and DHS price settings trigger adjustments to the total

reimbursement that a hospital receives for providing services to an MA patient.

(<u>Id.</u>)

### b)      2011 Amendment to Minnesota Statutes Section 256.969

In July 2011, Governor Mark Dayton signed into law an amendment to

Minnesota Statute section 256.969 ("the 2011 Amendment").  (<u>Id.</u> ¶ 12.)  The

purpose of the 2011 Amendment was to decrease government expenditures during a time of fiscal austerity by reducing MA reimbursements for hospital inpatient services by ten percent.  (Id.)  However, the 2011 Amendment excluded some children's hospitals from the reimbursement reduction:

> **Subd. 3c. Rateable reduction and readmissions reduction.**
> (a) The total payment for fee for service admissions occurring on or after September 1, 2011, through June 30, 2015, made to hospitals for inpatient services before third-party liability and spend down, is reduced ten percent from the current statutory rates. Facilities defined under subdivision 16, long-term hospitals as determined under the Medicare program, <u>children's hospitals whose inpatients are predominantly under 18 years of age</u>, and payments under managed care are <u>excluded</u> from this paragraph.
>
> (b) Effective for admissions occurring during calendar year 2010 and each year after, the commissioner shall calculate a regional readmission rate for admissions to all hospitals occurring within 30 days of a previous discharge. The commissioner may adjust the readmission rate taking into account factors such as the medical relationship, complicating conditions, and sequencing of treatment between the initial admission and subsequent readmissions.
>
> (c) Effective for payments to all hospitals on or after July 1, 2013, through June 30, 2015, the reduction in paragraph (a) is reduced one percentage point for every percentage point reduction in the overall readmissions rate between the two previous calendar years to a maximum of five percent.

Minn. Stat. § 256.969, subd. 3c. (emphasis added).

4

### 3.    Olson's Interpretation of the Amendment

In his capacity as Manager of Payment Policy and Rates Management at DHS, Olson claims he drafted the language of the 2011 Amendment.  (Id. ¶ 13.) He claims that the 2011 Amendment was designed to exempt the three well-recognized Minnesota children's hospitals from the MA reimbursement reduction, since they were known to rely disproportionately on MA revenue. (Id. ¶¶ 14, 25.)  MA admission rates for the three well-known children's hospitals are as follows:  Minneapolis Children's Hospital, 65%; St. Paul Children's Hospital, 48%; and Gillette Children's Specialty Healthcare 45%; compared to FUMC, with 27% MA admissions.  (Id. ¶ 25.)

### 4.    Statutory Definitions

The precise term "children's hospital" is not defined by any Minnesota statute.  Instead, relevant Minnesota state statutes explain that "hospital" is "a facility defined in section 144.696, subdivision 3, and licensed under sections 144.50 to 144.58 . . . ."  Minn. Stat. § 256.9686, subd. 6 (2011).  In turn, section 144.696 defines "hospital" as "any acute care institution licensed pursuant to sections 144.50 to 144.5 . . . ."  Minn. Stat. § 144.696 (2011).  Section 144.50, subd. 2, states:

> [h]ospital . . . shall mean any institution, place, building, or agency,
> in which any accommodation is maintained, furnished, or offered
> for five or more persons for: the hospitalization of the sick or
> injured; the provision of care in a swing bed authorized under
> section 144.562; elective outpatient surgery for preexamined,
> prediagnosed low risk patients; emergency medical services offered
> 24 hours a day, seven days a week, in an ambulatory or outpatient
> setting in a facility not a part of a licensed hospital; or the
> institutional care of human beings.

(2011).

### 5.     The Meaning of "Children's Hospital" in Relation to the Amendment

As author of the 2011 Amendment, Olson claims that he chose the

particular "children's hospital" language so as to mirror the federal definition of

children's hospital.  (SAC ¶ 14.)  According to Olson, the federal definition of

"children's hospital" is "a hospital with patients that are under 18 years of age."

(Id.)  Olson states that DHS has not questioned the legal definition of children's

hospital, with the age restriction language, since at least 1989.  (Id. ¶ 14.)  During

the 1993 legislative session, Olson employed identical language to provide a nine

percent increase in MA funds exclusively to the three well-known children's

hospitals.  (Id.)

Olson further claims that in order to be considered a children's hospital, a

hospital must be separately licensed.  (Id. ¶¶ 15, 24.)  He explains that Amplatz is

6

a "children's unit" within FUMC, but it is not a separately licensed hospital.  (<u>Id.</u>

¶ 15.)  Therefore, it is not a "children's hospital" under relevant statutes.  (<u>Id.</u> ¶

24.)

### 6.    FUMC Approaches DHS

In approximately November 2011, FUMC representatives met with DHS to

discuss several legislative issues, including the 2011 Amendment.  (<u>Id.</u>, Ex. F-6.)

During that meeting, then-Assistant DHS Commissioner Scott Leitz and Director

of Purchasing & Service Delivery Mark Hudson discussed whether Amplatz

could be exempt from the rate reduction.  (<u>Id.</u>)

### 7.    Hudson Approaches Olson

Sometime immediately before or after the November 2011 meeting with

FUMC, Hudson asked Olson why Amplatz was not exempt from the ten-percent

MA rate reduction.  (<u>Id.</u> ¶ 17.)  Olson recalls explaining to Hudson the relevant

law and legislative history.  (<u>Id.</u>)  He informed Hudson that excluding Amplatz

would require new legislation.  (<u>Id.</u>)

### 8.    Hudson Inquires a Second and Third Time

Olson alleges that Hudson confronted him about the Amplatz exemption

again in January 2012, and once more on August 8, 2012.  (<u>Id.</u> ¶¶ 17, 18.)  Olson

recalls that Hudson stressed that he was making the inquiry on behalf of Leitz and James Golden, DHS Deputy Assistant Commissioner.  (Id. ¶ 18.)

Olson replied to Hudson's August 8 inquiry by e-mail, explaining that Amplatz is a "hospital within a hospital."  (Id., Ex. A.)  Because Amplatz does not have a separate hospital license, Olson explained that it cannot be exempted from the MA rate reduction.  (Id.)  He then forwarded the correspondence to Ann Berg, Deputy Medicaid Director and primary federal compliance attorney, to alert her to Hudson's inquiries.  (Id., Ex. B.)  Berg verbally warned Olson that "he should be careful," and that "[Hudson, Leitz, and Golden are] not a management group that you said no to."  (Id. ¶ 19.)

### 9.   DHS Excludes FUMC from Reduction, Reimburses FUMC

On October 12, 2012, DHS employee Steve Masson informed Olson that Leitz and Golden had met with FUMC lobbyists.  (Id. ¶ 20.)  Masson disclosed an arrangement to exclude all FUMC patients under age 18 from the rate reduction. (Id.)  Masson revealed that Golden and Hudson gave orders to Rachel Cell, a DHS payment processing director, instructing her to implement Amplatz's MA rate reduction exemption.  (Id.)  In turn, Masson was to execute changes in MA

computer programming to reflect the exemption,[1] retroactive to September 1,

2011.  (Id.)  Because the exemption was applied retroactively, Masson delivered a

$500,000 reimbursement to FUMC.  (Id. ¶ 21.)  Olson witnessed verification of

the $500,000 reimbursement check on October 23, 2012.  (Id.)

Olson insists that Leitz, Golden, and Hudson did not have official

delegated authority to set MA rates for hospitals.  (Id. ¶ 29.)

### 10.   Olson's Concerns Precipitate an Audit

In July 2013, Olson informed DHS Commissioner Lucinda Jesson

("Jesson") of his concerns over the Amplatz exemption.  (Id. ¶ 31.)  He also met

with DHS Internal Audit Director Gary J. Johnson and DHS Office of the

Inspector General Chief Legal Counsel Bridgid Dowdal ("Dowdal").  (Id.)

Johnson and Dowdal conducted an audit in order to investigate Olson's

allegations.  (Id., Ex. F.)  Johnson issued a completed audit report ("Audit

Report") to Jesson on October 1, 2013.  (Id. at F-1.)

### a)   The Audit Report's Findings

Initially, the Audit Report found "a lack of clarity in the statutory

definition of what constitutes a children's hospital."  (Id. at F-6.)  Nevertheless,

---

[1] To adjust MA reimbursement rates, DHS applies a series of computer codes. (SAC ¶ 35.)  "LQ" is the DHS code that triggered a ten percent MA reimbursement reduction.  (Id.)

the Audit Report concluded that "it [did] not appear that DHS' decision to give

Amplatz retroactive exemption from the 10% rate reduction under [Minn. Stat.]

256.969 was consistent with the law or how other similarly situated children's

facilities are treated," (id. at F-6) and further, that the decision to exempt

Amplatz "appear[ed] to be contrary to prior internal policy determinations of

what constitutes a children's hospital." (Id. at F-7.)

During an investigatory interview, both Golden and Leitz acknowledged

that "a driving factor in Amplatz getting the exemption was based upon the fact

that [FUMC] approached DHS to discuss the issue." (Id. at F-6.) The Audit

Report suggested that the decision to exclude Amplatz was almost exclusively

handled by Leitz. (Id.)

### b)   Audit Report Recommendation

The Audit Report recommended that DHS obtain a formal legal opinion

on the question of whether Amplatz should be exempted by the 2011

Amendment. (Id. at F-7.) If the opinion concluded that it was improper to

exempt Amplatz, it recommended that DHS "immediately revoke the exemption

and take back any excess amounts" paid to FUMC. (Id.)

**11.   DHS Receives Legal Opinion, Requests Recovery of Overpayment from FUMC**

On November 5, 2013, Leitz sent a letter to FUMC.  (SAC, Ex. G.)  The letter indicated that DHS had conducted an audit, and pursuant to the Audit Report, it received a legal opinion regarding whether Amplatz should be excluded from the MA rate reduction.  (Id.)  Because the opinion found that it was likely that Amplatz should not have been excluded, Leitz notified FUMC that it was ending the exemption.  (Id.)  By letter dated November 5, 2013, Leitz explained to FUMC that despite all parties acting in good faith with regard to interpretation of the statute, DHS would be calculating overpayment and issuing a notice of recovery.  (Id.)

**12.   Olson Alleges Retaliation**

Olson alleges that he was retaliated against for reporting the Amplatz arrangement.  (SAC ¶ 33.)  On February 12, 2013, Hudson, Golden, and two other DHS employees met with Olson.  (Id.)  They told him that he was being moved to a new position at DHS.  (Id.)  Olson was relocated from an office to a cubicle.  (Id.)  On February 28, 2013, he was given the lowest performance rating at DHS, in contrast to the "outstanding" and "above expectations" rating he received on the previous six evaluations.  (Id. ¶ 33.)

On October 28, 2013, Olson received an anonymous death threat by

telephone call at his home.  (Id. ¶ 34.)  He commenced an action for retaliation

against DHS in Ramsey County District Court on March 19, 2014, captioned

Olson v. Minn. Dept. Human Servs., Case No. 62-cv-14-1624.

### 13.    Minnesota State Legislature Amends Section 256.969

In May 2014, the Minnesota State Legislature amended Minnesota Statute

section 256.969 ("the 2014 Amendment") to create a retroactive MA rate for

exemption exclusively for FUMC.  The 2014 Amendment reads:

> Subd. 3c. **Rateable reduction and readmissions reduction.** (a) The
> total payment for fee for service admissions occurring on or after
> September 1, 2011~~, through June 30, 2015~~ to October 31, 2014, made
> to hospitals for inpatient services before third-party liability and
> spenddown, is reduced ten percent from the current statutory rates.
> Facilities defined under subdivision 16, long-term hospitals as
> determined under the Medicare program, children's hospitals whose
> inpatients are predominantly under 18 years of age, and payments
> under managed care are excluded from this paragraph.
>
> . . .
>
> (c) Effective for payments to all hospitals on or after July 1, 2013,
> through ~~June 30, 2015~~ October 31, 2014, the reduction in paragraph
> (a) is reduced one percentage point for every percentage point
> reduction in the overall readmissions rate between the two previous
> calendar years to a maximum of five percent.
>
> *(d) The exclusion from the rate reduction in paragraph (a) shall apply to a*
> *hospital located in Hennepin County with a licensed capacity of 1,700 beds*
> *as of September 1, 2011, for admissions of children under 18 years of age*

12

> *occurring on or after September 1, 2011, through August 31, 2013, but*
> *shall not apply to payments for admissions occurring on or after September*
> *1, 2013, through October 31, 2014.*
>
> (e) Effective for discharges on or after November 1, 2014, from
> hospitals paid under subdivision 2b, paragraph (a), clauses (1) and
> (4), the rate adjustments in this subdivision must be incorporated
> into the rebased rates established under subdivision 2b, paragraph
> (c), and must not be applied to each claim.
>
> **EFFECTIVE DATE.** Paragraph (d) is effective retroactively from
> September 1, 2011, and applies to admissions on or after that date.

Minn. Stat. § 256.969, subd. 3c.(d) (2014) (emphasis in italics).

### A.    Procedural History

Olson filed an initial qui tam complaint against FUMC under seal on

September 23, 2013.  [Docket No. 1]  The Complaint alleged violations of the

Federal False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G), as well as

violations of the Minnesota False Claims Act, Minn. Stat. §§ 15C.02(a)(1), (2), (3)

and (7).

On November 1, 2013, the State of Minnesota filed a notice of declination

of intervention.  [Docket No. 4]  The United States declined intervention on

March 31, 2014.  [Docket No. 18]

Olson has twice amended his Complaint.  He filed a First Amended

Complaint ("FAC") [Docket No. 14] on December 12, 2013, followed by the SAC

[Docket No. 20] on April 18, 2014.  The FAC added allegations related to the

Audit Report.  The SAC provided more detail about allegedly fraudulent billings

submitted by FUMC.  On April 30, 2014, the Court ordered Olson to unseal and

serve the SAC on UMMC.  [Docket No. 21]  Olson served the Second Amended

Complaint on UMMC on June 19, 2014.  [Docket No. 24]

The SAC renews Olson's claims under the state and federal false claims

acts.  Count I alleges violations of:

> 31 U.S.C. § 3729(a)(1)(A), for knowingly presenting, or causing to be
> presented, false or fraudulent claims for payment or approval of
> Medicaid monies, knowing that FUMC did not legally qualify for
> the exemption from the ten percent reduction in Medicaid payments
> under Minnesota Statute 256.969, Subd. 3c.;

> 31 U.S.C. § 3729(a)(l)(B), for knowingly making, using, or causing to
> be made or used, false records or statements material to a false or
> fraudulent claim when FUMC submitted billings to DHS for MA
> monies in excess of those they were legally entitled to receive;

> 31 U.S.C. § 3729(a)(l)(C), for illegally conspiring with DHS
> employees, including at least Mark Hudson, Scott Leitz and James
> Golden, to obtain illegal amounts of MA monies, in violation of 31
> U.S.C. § 3729(a)(1) subparagraphs (A), (B) and (G); and,

> 31 U.S.C. § 3729(a)(l)(G), for knowingly concealing an obligation to
> pay back MA monies to the federal and state government that
> FUMC knew it illegally received.

Count II reiterates all claims enumerated in Count I under the Minnesota FCA, Minn. Stat. sections 15C.02(a)(1), (2), (3) and (7).

Under the Minnesota FCA, Olson requests an award up to three times the amount alleged to have been wrongfully taken by UMMC, in addition to per claim penalties of $6,000 to $11,000, not including attorney's fees, costs and interest.  Under the federal FCA, he requests his full share of any recovered sum as governed by 31 U.S.C. § 3730(d), plus fees, costs and interest.

If the Court grant's FUMC's Motion to Dismiss, Olson requests leave to amend the Complaint a third time, pursuant to Local Rule 15(a) and Rule 15 of the Federal Rules of Civil Procedure.

## II.    DISCUSSION

### A.    Standard of Review

#### 1.    Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, based on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true.  Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).  The Court need not accept a plaintiff's legal conclusions.  Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010)

(citing <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007)).  A complaint

must allege "enough facts to state a claim to relief that is plausible on its face."

<u>Twombly</u>, 550 U.S. 544, 547 (2007).

      In deciding a motion to dismiss, a court can consider "the complaint,

matters of public record, orders, materials embraced by the complaint, and

exhibits attached to the complaint."  <u>PureChoice, Inc. v. Macke</u>, Civ. No. 07-1290,

2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing <u>Porous Media Corp. v. Pall

Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999)).

**B.**    **Pleading Fraud Under the FCA**

      FCA claims, when grounded in fraud, must satisfy heightened pleading

requirements of Federal Rule of Civil Procedure 9(b).  <u>See</u> <u>United States ex rel.

Roop v. Hypoguard USA, Inc.</u>, 559 F.3d 818, 822 (8th Cir. 2009); <u>United States ex

rel. Costner v. URS Consultants, Inc.</u>, 317 F.3d 883, 888 (8th Cir. 2003).  "In

alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake," but "[m]alice, intent, knowledge, and other

conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

      The Eighth Circuit requires that a complaint "plead such facts as the time,

place, and content of the defendant's false representations, as well as the details

of the defendant's fraudulent acts, including when the acts occurred, who

engaged in them, and what was obtained as a result." United States ex rel. Joshi

v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006).  In other words, the

plaintiff must identify the "who, what, where, when, and how" of the fraud

being alleged.  Costner, 317 F.3d at 888 (citing Parnes v. Gateway 2000, Inc., 122

F.3d 539, 550 (8th Cir. 1997)).

###    C.    The Federal/State False Claims Acts

Because the Minnesota FCA parallels the federal FCA, the Court will

analyze Olson's state and federal claims under a unified FCA framework.  See,

e.g., Nhut Le v. Wells Fargo Bank, NA, Civ. No. 13–1920, 2014 WL 1672260, at *9

(D. Minn. Mar. 17, 2014) (recommending dismissal of relator's Minnesota FCA

claims for "substantially the same reasons [as] claims under parallel federal"

FCA).

The FCA "protect[s] the federal fisc by imposing severe penalties on those

whose false or fraudulent claims cause the government to pay money."  United

States ex rel. Vigil v. Nelnet, Inc., 639 F.3d 791, 796 (8th Cir. 2011).  It "attaches

liability, not to the underlying fraudulent activity, but to the 'claim for

payment.'"  Costner, 153 F.3d at 677 (quoting United States ex rel. Hopper v.

Anton, 91 F.3d 1261, 1266 (9th Cir. 1996)).  The FCA's "core provisions" impose

liability on any person who "(1) knowingly presents, or causes to be presented, a

false or fraudulent claim for payment or approval," or "(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." Vigil, 639 F.3d at 796; 31 U.S.C. § 3729(a)(1)-(2).

### D.    Theories of Liability Under the FCA

Courts generally recognize three theories of liability under the FCA. See United States ex rel. Colucci v. Beth Israel Med. Ctr., 785 F. Supp. 2d 303, 311 (S.D.N.Y. 2011).  FCA claims fall under a "factually false" category or two distinct "legally false" categories.  Colucci, 785 F. Supp. 2d at 311.

Factually false claims allege that a government payee has submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001); United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 114 (2d Cir. 2010) (explaining that a factually false claim as one where the payee "bills for something it did not provide").

Alternatively, a claim for government funds is legally false "where a party certifies compliance with a statute or regulation as a condition to governmental payment." Mikes, 274 F.3d at 697.  False certification occurs either expressly or impliedly.  Id. at 697-700.  An expressly false claim is one "that falsely certifies

18

compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Id. at 698. In contrast, the implied false certification theory is "based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." Id. at 699 (citation omitted).

### E.   Olson's Claims Under the FCA

Olson's Complaint alleges that FUMC knowingly engaged in certain misconduct aimed at inducing DHS officials to ignore the clear command of state statutes. As a result, FUMC collected a substantial sum of MA funds that, according to Olson, it was not entitled to receive. For the reasons that follow, the Court concludes that Olson has not stated a claim for relief under the FCA.

### 1.   Olson's "Presentation" Cause of Action Under 31 U.S.C. § 3729(a)(1)(A)

Olson has alleged a violation of 31 U.S.C. § 3729(a)(1)(A), which imposes liability on a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." A prima facie case under section 3729(a)(1)(A) requires that "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim

was false or fraudulent."  <u>United States v. Basin Elec. Power Co-op.</u>, 248 F.3d 781, 803 (8th Cir. 2001).

Olson argues that FUMC presented false claims to the government in two ways.  First, FUMC made "improper oral requests and demands" from DHS while lobbying for an exemption to the ten-percent MA rate reduction.   Olson borrows the "requests and demands" language from the statutory definition of "claim" under the FCA, wherein a claim means "any request or demand, whether under a contract or otherwise, for money or property . . . (i) [that is] presented to an officer, employee, or agent of the United States."  31 U.S.C. § 3729(b)(2).  Second, Olson argues that having been granted an exemption, FUMC violated the FCA every time it submitted a subsequent claim for MA.

### a)      Improper Oral Requests and Demands

To support his claim that FUMC's requests for an exemption are prohibited by the FCA, Olson argues that courts have broadly interpreted the term "claim" to include both obviously false information as well as a person's failure to disclose misconduct that "taints" a claim.  He cites to <u>United States v. Neifert-White Co.</u>, a 1968 United States Supreme Court case involving fraudulent loan applications to The Commodity Credit Corporation, a federal agency.  390 U.S. at 228.  In ruling for the United States, the Court held that the term "claim"

encompasses not just payments "due and owing from the Government," but "all

fraudulent attempts to cause the Government to pay out sums of money."  Id. at

230, 233.

Olson's reliance on Neifert-White is unavailing.  Minnesota statutes do not

define "children's hospital."  As DHS noted in its Audit Report, the precise

definition of the term is unclear.  Given the lack of clarity in relevant statutes,

and absent particular evidence of fraud or false statements, FUMC's reasonable

lobbying efforts to exempt Amplatz from the ten-percent MA rate reduction

cannot properly be characterized as a false claim under the FCA.  See United

States ex rel. Hixson v. Health Mgmt. Sys., Inc., 613 F.3d 1186, 1190 (8th Cir. 2010)

("[A] reasonable interpretation of a statute cannot support a claim under the FCA

if there is no authoritative contrary interpretation of that statute."); Lamers v.

City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999) (stating that "imprecise

statements or differences in interpretation growing out of a disputed legal

question are . . . not false under the FCA") (citation omitted); Colucci, 785 F.

Supp. at 314 (holding that it is not fraud to "[take] advantage of the uncertainty"

in MA regulations to maximize MA payments).

Taking the facts alleged to be true, Olson's SAC merely illustrates that FUMC petitioned government for a favorable interpretation of unclear statutes. This is not fraudulent conduct under the FCA.  Therefore, the Court rejects Olson's "improper oral requests and demands" argument.

### b)    Knowingly Making Claims for MA that Would Ultimately be Exempt from the Ten Percent MA Reimbursement Reduction

Olson further alleges that FUMC submitted "false or fraudulent claims" in violation of section 3729(a)(1)(A) by continuing to knowingly submit thousands of claims for MA funds that would ultimately be exempt from the ten percent reimbursement reduction.

To advance this theory of liability, Olson argues that a claim can be rendered false or fraudulent by attendant facts not apparent on the face of the claim; no factual lies are necessary.  Olson calls this Court's attention to Marcus v. Hess, a 1942 Supreme Court case where a collusive bid-rigging scheme was found to have violated the FCA.  317 U.S. 537.  In holding that the rigged bids caused the government to enter into a contract, the Court reasoned that the fraud "did not spend itself with the execution of the contract," but rather "entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [government]."  Id. at 543.  Like the "swollen estimates" causing

22

government to pay funds in <u>Marcus</u>, Olson alleges that FUMC's misrepresentations to DHS render each of its subsequent claims for MA funds unlawful under the FCA.

The Court is not persuaded.  It is well-settled that to satisfy the falsity element of section 3729(a)(1)(A), the statement or conduct at issue must be a falsehood.  <u>See</u>, <u>e.g.</u>, <u>United States ex rel. Dunn v. N. Mem'l Health Care</u>, Civ. No. 10–4673, 2012 WL 6552791, at *5 (D. Minn. Dec. 14, 2012) ("Without sufficient allegations of materially false claims, [a False Claims Act] complaint fails to state a claim on which relief can be granted.") (quoting 639 F.3d at 796).  Unlike the inflated bids at issue in <u>Hess</u>, Olson has not alleged any misrepresentations within FUMC's individual claims for MA.  Moreover, absent particular evidence that FUMC knowingly made false or fraudulent statements to DHS while lobbying for Amplatz's status as a children's hospital under unclear statutes, FUMC's claims for MA payment cannot give rise to liability under section 3729(a)(1)(A).

In sum, neither of the "false claims" alleged by Olson can, as a matter of law, support liability under the FCA.  The Court dismisses Olson's cause of action under section 3729(a)(1)(A).

### 2. Olson's Remaining Causes of Action Under 31 U.S.C. §§ 3729(a)(l)(B), (G) and (C)

Because the SAC does not sufficiently allege that FUMC submitted false or fraudulent claims to the government, and because the statutes at issue are unclear, Olson's remaining causes of action under sections 3729(a)(l)(B), (C),(G) and their Minnesota FCA equivalents must be dismissed.

#### a) 31 U.S.C. § 3729(a)(l)(B)

Olson has alleged a violation of section 3729(a)(1)(B), which imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Specifically, Olson alleges that FUMC made or used false records or statements material to a false or fraudulent claim when it submitted billings to DHS for MA monies in excess of those they were legally entitled to receive.

Olson has not alleged with sufficient particularity that FUMC made, used, or caused to be made or used, any false record or false statement.  As explained above, his SAC illustrates that FUMC approached DHS with a reasonable interpretation of unclear Minnesota statutes.  This conduct cannot sustain a violation of section 3729(a)(1)(B).  Therefore, the Court dismisses this claim.

#### b) 31 U.S.C. § 3729(a)(1)(G)

24

Having illegally acquired MA money, Olson alleges that FUMC knowingly

concealed an obligation to pay it back to the federal and state government.  The

FCA's "reverse liability" provision imposes liability on an individual who, in

relevant part, "knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the

Government."  31 U.S.C. § 3729(a)(1)(G).

Olson's "reverse liability" argument fails because Olson's SAC does not

allege with requisite particularity that FUMC knowingly concealed any

obligation to pay back funds it received under the 2011 or 2014 amendments,

including the $500,000 retroactive payment paid to FUMC in October, 2012.

Accordingly, the Court dismisses Olson's section 3729(a)(1)(G) claim.

### c)        31 U.S.C. § 3729(a)(l)(C)

Finally, Olson's SAC alleges FUMC violated section 3729(a)(1)(C) by

conspiring to violate sections 3729(a)(1)(A), (B) and (G).  Because the Court

determines that FUMC did not violate sections 3729(a)(1)(A), (B) and (G), Olson's

conspiracy FCA claim also fails as a matter of law.

### E.      Olson's Request for Leave to File a Third Amended Complaint

Under Federal Rule of Civil Procedure 15(a), the Court should grant leave

to amend a complaint "when justice so requires."  However, plaintiffs do not

have an absolute or automatic right to amend their complaints.  <u>Meehan v.</u>

<u>United Consumers Club Franchising Corp.</u>, 312 F.3d 909, 913 (8th Cir. 2002)

(citation omitted).  "[P]arties should not be allowed to amend their complaint

without showing how the complaint could be amended to save the meritless

claim."  <u>Wisdom v. First Midwest Bank</u>, 167 F.3d 402, 409 (8th Cir. 1999).

In his July 28, 2014 Memorandum in Opposition to Defendant's Motion to

Dismiss [Docket No. 41] Olson requested leave to amend his Complaint a third

time in the event that this Court granted FUMC's motion.  In addition to that

request, Olson filed a Motion to Alter/Amend/Supplement Pleadings [Docket

No. 47] on January 7, 2015, that was argued before Judge Keyes on January 30,

2015.  In order to avoid potentially conflicting rulings on Olson's multiple

requests to amend, Magistrate Judge Keyes denied Olson's January 7, 2015

motion without prejudice.  [Docket No. 58]

Olson seeks to amend his SAC in two ways.  First, he requests an

opportunity to clarify evidence of false statements made to DHS by FUMC

representatives, including the specific false statement that Amplatz was a "true"

children's hospital.  Second, the amendment will introduce Minnesota

Department of Human Services form DHS-4138 (Provider Agreement)

purportedly demonstrating that FUMC agreed to abide by federal and state statutes before receiving any MA funds from the government.

The Court has reviewed Olson's motion to amend, supporting documents, and relevant law.  Because the Court determines that Minnesota statutes relating to the definition of "children's hospital" are sufficiently unclear, the Provider Agreement is of no use to Olson.  Furthermore, Olson's clarification of FUMC's false statements amounts to a reiteration of facts already alleged in his SAC.  Olson's request for leave to amend his SAC will be denied.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.   Defendant's Motion to Dismiss [Docket No. 27] is **GRANTED**;

2.   Plaintiff's Second Amended Complaint [Docket No. 20] is **DISMISSED WITH PREJUDICE**;

3.   Plaintiff's Motions to Amend his SAC [Docket Nos. 41, 47] are **DENIED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 16, 2015                    s/ Michael J. Davis
                                          Chief Judge Michael J. Davis
                                          United States District Court